SIXTH DIVISION

MARCH 5, 2004

1-01-0532

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) No. 98 CR 23697

)

APRIL GOODMAN, ) Honorable

) John J. Moran, Jr.

Defendant-Appellant. ) Judge Presiding

JUSTICE TULLY delivered the opinion of the court:

Following a jury trial, defendant, April Goodman, was found guilty of solicitation of murder for hire (720 ILCS 5/8-1.2 (West 1998)), sentenced to 30 years' incarceration, and fined $25,000.  Defendant timely appeals contending:  (1) the trial court abused its discretion when it instructed the jury with a nonpattern instruction; (2) this matter must be remanded for fitness hearings because the trial court failed to make sufficient rulings regarding defendant's fitness for trial and sentencing; (3) the trial court improperly admitted evidence of other crimes and the State made improper arguments regarding that evidence; (4) the trial court improperly admitted evidence of a telephone conversation without an adequate foundation; and (5) the State improperly commented on defendant's failure to testify.  We affirm.

BACKGROUND

The essential allegations of the State's case against defendant are relatively straightforward.  On August 4, 1998, defendant met with an undercover police officer posing as a "hit man."  Defendant and the hit man discussed killing her ex-husband, Albert Goodman, and agreed on a price of $5,000.  On August 10, 1998, defendant met with the hit man again, gave him a $1,000 down payment, and asked him to kill Goodman.  Both conversations were recorded electronically.  Following the second encounter, the police arrested defendant and the State charged her with solicitation of murder for hire.

Defendant filed a motion to suppress statements she made to the police after her arrest.  On April 23, 1999, the trial court conducted a hearing on defendant's motion.  At the hearing, a police officer, an assistant State's Attorney, and defendant testified.  The trial court denied defendant's motion.  At the conclusion of the hearing, defense counsel requested a "BCX" (behavioral clinical examination) to determine if defendant was fit to stand trial.  The trial court ordered the examination and continued the matter.

On August 5, 1999, the trial court conducted a fitness hearing.  The parties stipulated that Dr. Matthew Markos "would testify" that based on his experience and training  he is qualified as an expert in the field of psychiatry.  The parties stipulated that Markos "would testify" that he had reviewed defendant's medical records and conducted a clinical interview.  The parties stipulated that Markos was of the opinion that defendant was fit to stand trial with medication.  The parties stipulated that defendant had a history of a mental disorder, bipolar type, and was currently in remission with medication.  The parties waived argument, and the trial court found that defendant was fit to stand trial without questioning defendant or hearing additional evidence.

Before trial, the State moved to allow the introduction of evidence that defendant had previously asked other individuals to kill Goodman.  The State argued that this evidence was relevant to establish defendant's motive and intent.  Defendant responded arguing that the evidence was not relevant and, if relevant, the probative value of the evidence was outweighed by its prejudicial effects.  On June 16, 2000, the trial court ruled that the evidence of other crimes was admissible.

The trial court commenced a jury trial on October 2, 2000.  Albert Goodman testified that he met defendant through the Great Expectations dating service in January 1995.  He and defendant were married in June 1995.  Goodman testified that problems with the marriage developed almost immediately.  Goodman filed for dissolution of the marriage in August 1995.  The couple separated and attempted reconciliation several times.  Goodman testified that, in June 1996, defendant attempted to push him down the stairs at a home they shared.  Goodman struggled with defendant but testified that he never struck her or attempted to push her down the stairs.  Goodman was later arrested in connection with the incident.  He was ultimately found not guilty of all charges.

Goodman further testified that, after the incident in June 1996, defendant informed him that she was pregnant.  Goodman testified that defendant had a miscarriage as the result of a "tubular pregnancy."  Goodman testified that, to his knowledge, nothing he had done caused defendant to miscarry.  The parties' marriage was ultimately dissolved in September 1997.  On August 10, 1998, Goodman received a telephone call from defendant.  Defendant told Goodman that she needed $10,000 for liposuction.  Goodman testified that, as part of the divorce settlement, he was required to pay for defendant's medical and psychiatric needs.  Goodman told defendant that he had already paid for liposuction and would not give her any additional money.  Defendant responded, "That settles it then, you are evil," and hung up the telephone.

Nicholas Ellis testified that, in May or June of 1997, he met defendant in a bar in Oak Park.  Ellis made a joke about knowing someone who could break kneecaps.  Defendant seemed interested in the comment and asked Ellis if he was in the mafia.  Defendant gave Ellis her telephone number and they later agreed to meet for dinner.  The following weekend Ellis took defendant to dinner.  During dinner, defendant asked several times about a favor she needed.  Ellis asked about the favor, and defendant said she would tell him about it later.  After dinner, the couple saw a movie.  After the movie, Ellis asked about the favor again.  Defendant's demeanor changed, and she told Ellis that she needed someone to kill her husband.  Ellis told defendant that she had the wrong idea about him and took her home.  Ellis did not ask defendant for a second date.  Ellis did not report his conversation with defendant to the police until after he learned of her arrest in August 1998.

Hugh O'Neill testified that, in May or June of 1997, he met defendant in a bar in Chicago.  Defendant gave O'Neill her telephone number, and he called her to arrange a date the next week.  O'Neill took defendant to dinner.  During dinner, defendant asked O'Neill whether he would be willing to do something for her.  O'Neill asked what, and defendant asked if he would be willing to kill her ex-husband.  Defendant told O'Neill that her ex-husband had pushed her down a flight of stairs and killed her baby.  O'Neill told defendant he had no interest in helping her and ended the date.  Defendant said that she would have to find some other way and that she might try "hanging out in strip clubs" to find some guy willing to kill her husband.  O'Neill testified that he did not report his conversation with defendant to the police until after he learned of her arrest.

Victor Lazzaroni, a general contractor, testified that, in June 1997, he was meeting friends for dinner at a steakhouse on Rush Street in Chicago.  While he was seated in the bar area with his friends, Lazzaroni saw defendant standing near their table.  One of Lazzaroni's friends, Seymour Goldstein, asked defendant to join them for a drink.  Lazzaroni asked defendant if she was married, and she responded that she was but wished she was not.  Defendant said that she wished her husband would die.  Lazzaroni cautioned defendant that she should not speak that way because someone might overhear.  Defendant said that she owned some real estate that she wanted to develop.  Goldstein told defendant she should speak to Lazzaroni because he was a builder.  Defendant joined Lazzaroni and his friends for dinner.  During dinner defendant discussed her plans to develop the real estate, but said that she could not do so until the divorce was final.  Defendant said she wished she could find someone to kill her husband.  Lazzaroni again cautioned her about speaking like that.  During dinner, Lazzaroni saw a business associate in the restaurant.  They briefly discussed a construction project and Lazzaroni gave the man his telephone number.  Lazzaroni left the restaurant after dinner.

Lazzaroni further testified that he received a telephone call from defendant a few days later.  Defendant left a voice mail message for him, said she was April, and asked him to call her.  Lazzaroni did not immediately recognize the name "April," but returned the telephone call.  Lazzaroni spoke to defendant, who told him that they had met at the restaurant and said that she would like to discuss the real estate development.  Lazzaroni said that he was busy and asked her to call back the next week.  Defendant telephoned Lazzaroni the next week and spoke about the real estate.  Lazzaroni asked if defendant's divorce was final, and she responded "not yet, but I wish that he would die."  Lazzaroni cautioned defendant not to speak that way.  Defendant said she wanted to meet with Lazzaroni and told him that she was in Itasca.  Lazzaroni was on his way to a meeting in Itasca and agreed to meet defendant at a hotel bar.  At the bar, defendant again said that she wished her husband would die or that she could pay someone to kill him.  Lazzaroni told her not to speak that way and told her to call him if she ever got the land.  Approximately one week later, defendant telephoned Lazzaroni again.  Lazzaroni was in his car approaching his home and told defendant that he would call her back.  Lazzaroni called defendant from his home telephone.  Lazzaroni testified that defendant again said that she wished she could find someone to kill her husband.  

Lazzaroni further testified that he began to worry that he might be criminally liable if defendant made good on her threats to find someone to kill her husband.  Lazzaroni called Ron Hasko, an acquaintance who worked for the Federal Bureau of Investigation (the FBI).  Lazzaroni's acquaintance was not available but his partner, Joseph Stiller, returned the telephone call.  Lazzaroni spoke to Stiller and told him about his conversations with defendant.  Stiller told Lazzaroni that someone from the FBI would telephone defendant and warn her that they were aware of the threats.  Lazzaroni never heard from defendant again.

Ronald Loch, an FBI special agent, testified that, in June 1997, he was assigned to a violent crimes task force in Chicago.  Loch conducted a follow up investigation of Lazzaroni's complaint.  Loch received a telephone number, 847-758-1107, from Lazzaroni.  Loch called the telephone number and a woman answered and identified herself as April Goodman.  Loch told the woman that he had information that she had "reached out to somebody to have her husband killed."  The woman asked who that person was.  Loch responded that he could not divulge that information.  The woman said that her husband had been spreading rumors about her and that he might be the source of the information.  Loch opened a case file and documented the telephone conversation, but did not attempt to locate Albert Goodman.

On cross-examination, Loch admitted that he had never spoken to defendant before or after the telephone conversation.  Loch admitted that he did not call 796-9600 to determine an address associated with the telephone number he called.  Loch testified that he and Stiller had driven past what they believed was defendant's home but did not locate her.  Loch testified that he did not see the woman he spoke to on the telephone but that she identified herself as April Goodman.  Loch admitted that he did not attempt to determine who had access to the telephone he had called.

Following cross-examination, defendant moved to strike Loch's testimony arguing that the State failed to lay a proper foundation for the admission of the conversation.  The trial court denied the motion, stating:

"The Court finds under the totality of the evidence that the manner of obtaining the number, the person identifying herself as April Goodman, the content of the statement combined is sufficient for foundation purposes, and you can argue weight to the jury."

Peter Bukiri, a retired Chicago police officer, testified that in August 1998 he was a violent crimes detective.  On August 3, 1998, Bukiri was assigned to investigate defendant.  When Bukiri was first assigned to the case he spoke to Barry Wolf (no testimony was given describing his relationship with the defendant).  After speaking to Wolf, Bukiri accompanied Wolf to his home.  Wolf made a telephone call to defendant while Bukiri listened on an extension.  Wolf told defendant that he had found "someone to take care of her problem."  Wolf told defendant that she could meet this person the next day at a restaurant on Rush Street.  Defendant asked if Wolf could still get her a gun.

Bukiri further testified that on August 4, 1998, he met with an assistant State's Attorney and prepared an affidavit and orders for a consensual overhear.  Bukiri obtained a court order authorizing the overhear and concealed an electronic recording device on his body.  At approximately 4 p.m., Bukiri and Wolf entered the restaurant.  Wolf introduced Bukiri to defendant and left the restaurant.  Bukiri identified two tape recordings made of his conversation with defendant and identified a transcript prepared from the tape recording.  Defendant told Bukiri she had several wishes, including a financial transfer and an arranged marriage to Goodman where he would drown on the honeymoon.  Bukiri told defendant that he did not do the things she was contemplating and asked defendant "you either want him killed or you don't want him killed."  Defendant replied "Well, I do."  Defendant and Bukiri continued their conversation.  Bukiri and defendant agreed that defendant would pay Bukiri $5,000 to kill Goodman and defendant would give him a $1,000 down payment.  Bukiri concluded the conversation saying "Before I walk away from here--you are gonna pay me $5,000 to kill him?"  Defendant said that she was concerned that Bukiri was setting her up, but then said "That's my idea."

Bukiri further testified that he met defendant again on August 10, 1998, in a parking lot.  Bukiri was driving an undercover vehicle that had been outfitted with audio and video recording devices.  Defendant said she wanted to talk and began a lengthy rambling commentary on her life and her acquaintance with Wolf.  Defendant's soliloquy included the following comments:  "I couldn't mess around once I started something.  I had to go through with it the whole way or I would be killed."  The conversation continued and Bukiri told defendant "if you hand me the $1,000, I'm gonna kill Albert in the next couple of days."  Defendant replied "I'm gonna give you the $1,000.  That's what I want to have happen but this whole time it was Barry doing it."  Bukiri testified that defendant handed him $1,000 in cash while they were sitting in the undercover vehicle.  A videotape shown to the jury depicted defendant handing Bukiri the money and Bukiri counting the money.

Joann Jontz testified that in 1997 she was defendant's roommate.  Jontz testified that defendant repeatedly said that she wanted Goodman killed.  The State asked Jontz whether "847-758-1107" was the telephone number at the townhouse she shared with defendant.  Jontz replied "From what I recall, yes."  Jontz further testified that no one else lived in the townhouse and that she never received a telephone call from an FBI agent.

The State rested its case, and defendant rested without presenting evidence.  The State submitted a proposed instruction on compulsion that included a modification of  Illinois Pattern Jury Instructions, Criminal No. 24-25.21 (3d ed. 1992) (hereinafter IPI Criminal 3d No. 24-25.21).  The modified instruction added the language "A threat of future death or great bodily harm is not sufficient to excuse criminal conduct."  Defendant objected to the modified instruction.  The trial court ruled that the proposed modification was in accordance with a similar instruction approved in 
People v. Carini
, 151 Ill. App. 3d 264 (1986), and that the modified instruction would be given over defendant's objection.  The trial court instructed the jury, and the parties made closing arguments.  Defendant made no objections during the State's arguments.  The jury retired to deliberate and subsequently found defendant guilty.  The trial court ordered a presentence investigation and continued the matter until November 3, 2000.

On November 3, 2000, defendant filed a motion for a new trial.  Defense counsel indicated that he believed defendant was having difficulty assisting him in preparation for sentencing and requested another BCX.  The trial court ordered a behavioral clinical examination and continued the matter for hearing on defendant's posttrial motions and sentencing.  On December 7, 2000, the trial court conducted a hearing on defendant's posttrial motions.  The trial court indicated that it had received a report from Dr. Markos regarding defendant's fitness.  Before the trial court heard arguments on the posttrial motions, the following colloquy occurred:

"THE COURT:  So the record is clear, the opinion of Doctor Markos is that defendant is fit for sentencing.

MR. BYRNE [assistant State's Attorney]:  We will stipulate to the report, Judge.

MR. BREEN [Defense counsel]:  If I may, Judge, for the record indicate that the report further states that she has a history of mental disorders.  Bipolar disorder mixed type but is currently in remission with psychotropic medications.  ***

The doctor indicates such that she is not experiencing any medical side effects which interfere with her fitness."

MR. BYRNE:  We will stipulate to that.

MR. BREEN:  So will I, your Honor.

THE COURT:  Given that, a couple of procedural matters, are both sides ready to proceed on the arguments on the motion for a new trial?"

The trial court did not make any further reference to defendant's fitness for sentencing.  The trial court subsequently denied defendant's posttrial motion.

On January 19, 2001, the trial court conducted a sentencing hearing.  The trial court heard evidence in aggravation and mitigation and continued the matter for sentencing.  On January 22, 2001, the trial court sentenced defendant to 30 years' incarceration and fined defendant $25,000.  Defendant filed a motion to reconsider the sentence.  The trial court denied defendant's motion to reconsider, and defendant timely appeals.

DISCUSSION

Although defendant has elected to organize her contentions of error differently, we will address the various contentions of error as they arose chronologically during trial.  Defendant contends that this matter must be remanded for a new fitness hearing and, if necessary, a new trial, because the trial court failed to make an independent judgment regarding her fitness to stand trial.  "[T]he due process clauses of the Illinois and United States Constitutions prohibit the prosecution of a defendant who is unfit for trial."  
People v. Cleer
, 328 Ill. App. 3d 428, 431 (2002), citing Ill. Const. 1970, art. I, §2; U.S. Const., amends. VI, XIV.  Once a 
bona fide
 doubt regarding a defendant's fitness has been raised, the trial court has a duty to hold a fitness hearing.  
Cleer
, 328 Ill. App. 3d at 431.  A trial court may rely on expert testimony regarding fitness, but ultimately the trial court must decide whether a defendant is fit to stand trial and the court may not abandon its role as decision maker by simply deferring to the opinion of an expert.  See 
People v. Contorno
, 322 Ill. App. 3d 177, 179 (2001).  A trial court may rely on stipulated testimony during a fitness hearing but must observe the "fine line" that separates the permissible use of stipulated testimony from the impermissible.  See 
People v. Mounson
, 185 Ill. App. 3d 31, 37 (1989), citing 
People v. Thompson
, 158 Ill. App. 3d 860 (1987).  The parties may stipulate to what an expert would testify, but they may not stipulate to an expert's conclusions regarding fitness.  
Contorno
, 322 Ill. App. 3d at 179.

At the pretrial fitness hearing, the record clearly reflects that the parties only stipulated to what Dr. Markos "would testify."  Further, the trial court had an ample opportunity to observe defendant when she testified during the suppression hearing.  Defendant observes, correctly, that the trial court did not question defendant during the fitness hearing or make express findings regarding the factors it considered when finding her fit for trial.  In light of the trial court's independent duty to determine a defendant's fitness to stand trial, a trial court may certainly exercise its discretion to pose questions to the defendant.  See 
People v. Johnson
, 327 Ill. App. 3d 203, 205 (2001) (recognizing a trial court's discretion to question witnesses to clarify ambiguities and help elicit the truth).  We also believe that appellate review of fitness findings would be enhanced if trial courts took a few moments to briefly state the bases for their findings regarding fitness.  However, we are aware of no statute or supreme court rule that requires trial courts to either independently question a defendant or make express findings of fact regarding fitness.  Although the record is not as clear as it could be, we nevertheless find that the pretrial fitness hearing conducted by the trial court fell on the permissible side of the "fine line" identified in 
Thompson
.  See 
Mounson
, 185 Ill. App. 3d at 37.  Therefore, we conclude that the procedure used by the trial court during the pretrial fitness hearing did not violate the requirements of due process.

Defendant also contends that the trial court erred when it admitted evidence of her earlier attempts to solicit someone to kill Goodman, because the danger of unfair prejudice outweighed the probative value of this evidence.  Evidence of other offenses is admissible if relevant to any issue other than a defendant's propensity to commit crime.  
People v. Bedoya
, 325 Ill. App. 3d 926, 937 (2001).  Such evidence is properly admitted to establish, for example, intent, identity, motive, or absence of mistake.  
Bedoya
, 325 Ill. App. 3d at 937.  If the trial court determines that other offense evidence is relevant, it must balance the probative value against the potential for unfair prejudice.  
Bedoya
, 325 Ill. App. 3d at 937.  Other offense evidence should be excluded if the probative value is substantially outweighed by the potential for unfair prejudice.  
Bedoya
, 325 Ill. App. 3d at 937.

At trial, defendant argued that she did not intend to have Bukiri kill Goodman because when she first met with Bukiri she was only considering a financial transaction.  Defendant also argued that Wolf was orchestrating defendant's interaction with Bukiri and that she was acting out of compulsion.  The other offense evidence was highly probative of all of these issues.  Evidence that defendant asked several different men to kill Goodman, years before she met Bukiri, negates the inference that she was considering a purely financial arrangement.  The same evidence negates the inference that Wolf was orchestrating defendant's actions, because there was no evidence that she had even met Wolf when she asked the other men to kill Goodman.  The other offense evidence also suggests that defendant's intent to kill Goodman arose prior to and independent of whatever threat of violence might have been made against her.  We find that the other offense evidence was highly probative of several key issues in the case.

Defendant argues that the potential for unfair prejudice was high because the State created a "mini-trial" about the other offense evidence.  Defendant argues that the amount of other offense evidence was excessive because five of seven witnesses testified about the other offenses.  We find this comparison of the number of witnesses testifying about various aspects of the case meaningless.  The State was required to produce numerous other offense witnesses only because defendant expressed her desire to have Goodman killed to so many different people.  Conversely, only a single witness was required to establish the elements of the substantive offense because Bukiri was a witness to all of the relevant acts.  We do not find that the potential for unfair prejudice was significant.  Therefore, we conclude that the trial court did not err when it admitted the other offense evidence.

Defendant contends that the trial court erroneously admitted Loch's testimony regarding his telephone conversation with defendant because it lacked an adequate foundation.  A mere assertion by a telephone caller as to his or her identity, being hearsay, cannot be taken as a sufficient showing of the other person's identity.  
People v. Caffey
, 205 Ill. 2d 52, 94 (2001).  However, even if a witness is unable to identify a caller's voice, the caller's identity can be established through other circumstantial evidence.  
Caffey
, 205 Ill. 2d at 94-95.

In this case we believe, as the trial court did, that there was sufficient circumstantial evidence to establish that Loch spoke to defendant on the telephone.  Lazzaroni identified defendant and testified that he had spoken to her on the telephone several times.  Lazzaroni further testified that he had initiated several of the telephone calls.  Loch testified that he obtained a telephone number for defendant from Lazzaroni.  Loch testified that he called the number and spoke to a woman.  The woman identified herself as defendant.  During the conversation, the woman, although she did not admit solicitation of murder, did not express surprise that someone had reported that she had done so.  We note that Loch did not attempt to confirm through the telephone company that the number Lazzaroni gave him was listed to defendant or otherwise confirm the identify of the woman to whom he spoke.  We also note that the State did not ask Lazzaroni to verify the telephone number at which he reached defendant.  However, we believe that these factors affect only the weight not the admissibility of the evidence.  Therefore, we conclude that the trial court did not abuse its discretion when it admitted this evidence.

Defendant contends that the State made several improper comments during closing arguments.  Defendant argues that the State made improper arguments regarding the other offense evidence including the telephone conversation Loch described in his testimony.  Defendant also argues that the State improperly commented on her failure to testify.  Defendant did not object to these comments during trial, and therefore, she has waived this issue on appeal.  See 
People v. Kuntu
, 
196 Ill. 2d 105, 129 (2001).  Defendant urges us to consider these contentions under the plain error doctrine.  We have considered the allegedly improper comments in the context of the State's entire closing argument.  We do not find the comments so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten the deterioration of the judicial process.  See 
Kuntu
, 
196 Ill. 2d at 129.  Therefore, we find no plain error to excuse defendant's procedural default.

Defendant also contends that the trial court abused its discretion when it gave the jury a modified instruction on compulsion.  Supreme Court Rule 451(a) (134 Ill. 2d R. 451(a)) requires a trial court to instruct the jury pursuant to the pattern criminal instructions, unless the trial court determines that the pattern instruction does not accurately state the law.  
People v. Nutall
, 312 Ill. App. 3d 620, 633 (2000).  Although a trial court should use a pattern instruction if an appropriate one exists, the decision whether to give a non-pattern instruction remains a matter with the sound discretion of the trial court.  
Nutall
, 312 Ill. App. 3d at 633.

As given by the trial court, the compulsion instruction, IPI  Criminal 3d No. 24-25.21, reads:

"It is a defense to the charge made against the defendant that she acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if she reasonably believed death or great bodily harm would be inflicted upon her if she did not perform the conduct with which she is charged."

The trial court modified the instruction by adding the following language:

"A threat of future death or great bodily harm is not sufficient to excuse criminal conduct."

Defendant argues that the modified instruction conflicts with the pattern instruction and misstates the law because "future" is not the opposite of "imminent."  Defendant argues that because any threat of harm must relate to the "future," all threats of harm, even imminent threats of harm, would be improperly excluded from the compulsion defense by the instruction given by the trial court.  In 
People v. Carini
, 151 Ill. App. 3d 264 (1986), this court considered similar arguments challenging a nearly identical modification to the compulsion instruction.  The 
Carini
 court concluded that the modification "merely clarifies the term 'imminent' " and held that giving the modified instruction did not constitute an abuse of discretion.  
Carini
, 151 Ill. App. 3d at 283.  We also believe that the modified instruction merely clarifies the term "imminent" and find no reason to depart from the logic of, or the holding reached in, 
Carini
.  Therefore, we conclude that the modified instruction accurately stated the law.

We also conclude that the modified instruction was appropriately given in this case.  Defendant's compulsion defense was based solely on the comment she made to Bukiri that she "would be killed" if she did not go through with the plan to solicit him to murder Goodman.  This comment reveals no detail about who made the threat, when it would be carried out, or by whom.  We believe that the jury could find that this vague comment referred only to a "future" threat of injury.  Accordingly, we conclude that the evidence supported the modified instruction, and the trial court did not abuse its discretion when it gave the modified instruction to the jury.

Finally, defendant contends that this matter should be remanded for a new hearing regarding her fitness for sentencing, because the fitness hearing conducted by the trial court failed to comply with due process.  We agree with defendant that the report of proceedings raises serious questions about whether the proceedings met the due process requirements for a fitness hearing.  Specifically, the parties stipulated to "the report."

We believe our review of the fitness hearing should begin with a more fundamental question, 
i.e.
, was there a 
bona fide
 doubt regarding defendant's fitness for sentencing?  After examining the relevant portions of the record in context, it appears to us that the fitness hearing the trial court conducted was prompted not by a 
bona fide
 doubt regarding defendant's fitness but by an abundance of caution and defense counsel's desire to make a complete record.  Although defense counsel had expressed some concern regarding defendant's ability to assist in preparation for the sentencing hearing, he presented no specific examples and merely noted that defendant might be receiving different medication than those considered during the initial fitness hearing.  Accordingly, we believe that when the parties stipulated to the report, they were, in fact, stipulating that nothing in the report was sufficient to raise a 
bona fide
 doubt regarding fitness.  This view of the proceedings, explains the trial court's failure to make an explicit finding regarding fitness; fitness was no longer an issue.  Therefore, we conclude that the hearing the trial court conducted did not implicate the due process concerns inherent in a fitness hearing because no 
bona fide
 doubt regarding fitness remained after the parties stipulated to the psychiatrist's report.  Accordingly, we reject defendant's argument that the second fitness hearing violated her right to due process.

Although we hold that the hearing conducted in this case did not violate due process, we believe it is appropriate to caution trial courts regarding their obligations regarding fitness hearings.  We believe the better practice would be for trial courts to make an express finding as to whether a 
bona fide
 doubt regarding fitness exists before ordering a clinical examination.  Trial courts should also scrutinize stipulations regarding psychiatric reports carefully.  Finally, if a trial court conducts a fitness hearing, whether or not it is based on a stipulation, the trial court should make an express finding on the record regarding the defendant's fitness, and when appropriate, briefly summarize the basis for its finding.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

GALLAGHER and O'BRIEN, JJ., concur.