2023 IL App (2d) 210765-U
No. 2-21-0765
Order filed January 3, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

___

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

___

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-428 |
| DARRYL JACKSON, | ) ) ) | Honorable Philip G. Montgomery, |
| Defendant-Appellant. | ) | Judge, Presiding. |

___

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Reversed and remanded where defendant, after being found unfit, was tried without the court finding him restored to fitness.

¶ 2    Defendant, Darryl Jackson, was convicted of attempted armed robbery (720 ILCS 5/8-4(a), 18-2(a)(1) (West 2018)) and aggravated assault (720 ILCS 5/12-2(c)(1) (West 2018)).  The trial court sentenced defendant to nine years' imprisonment.  Defendant appeals, arguing that he was not properly found fit to stand trial and that, at sentencing, the court improperly considered in aggravation a factor inherent in the offense.  For the following reasons, we reverse and remand.

¶ 3                          I. BACKGROUND

¶ 4                                    A. Indictment and Fitness

¶ 5      On August 26, 2019, defendant was charged by a two-count indictment for events that took place on August 7, 2019, at a Fifth Third Bank in Sycamore. In count I, defendant was charged with attempted armed robbery in that, while armed with a knife, he knowingly demanded money from Jacob Klein, a bank employee. Further, in count II, defendant was charged with aggravated assault in that, when angered by Klein, defendant pulled out the knife and yelled, "Don't fuck with me," while demanding his money.

¶ 6      At his bond hearing on August 8, 2019, defendant rejected the appointment of counsel, explained that he had an agreement with the United States of America not to be prosecuted, and asserted that his arrest violated the Magna Carta. The court, Judge Philip G. Montgomery presiding, did not order a fitness evaluation; rather, it set a bond amount.

¶ 7      On September 6, 2019, the court held a preliminary hearing. In part, the court explained the charges to defendant and that, due to his prior criminal history, if convicted of count I, he was eligible for Class X sentencing. The State raised doubt as to defendant's fitness, noting that defendant's family and jail personnel had also raised questions on that issue, but the court disagreed and found that defendant had clearly and appropriately responded to all questions concerning his decision to proceed *pro se*. The court's written order continued the case and reflected that the court found defendant "lucid and coherent and [it] ha[d] no question as to defendant's competency."

¶ 8      On October 31, 2019, however, the State again informed the court, this time with Judge Robbin Stuckert presiding, that it had a *bona fide* doubt regarding defendant's fitness to stand trial. The State noted that it had received numerous calls from the jail that implicated defendant's fitness for trial. Accordingly, pursuant to section 104-13 of the Code of Criminal Procedure of 1963

(Code) (725 ILCS 5/104-13 (West 2018)), Judge Stuckert ordered a fitness evaluation. On January 15, 2020, a fitness report was filed, reflecting that the court-appointed evaluator, Dr. Jayne Braden, had found defendant unfit. Judge Stuckert then explained to defendant that there would be a fitness hearing held (pursuant to section 104-16 of the Code (*id.* § 104-16)), and defendant elected for that hearing to be held before a jury.

¶ 9 On February 24, 2020, Judge Montgomery presided over the fitness hearing. Defendant continued to proceed *pro se*. After jury selection, Dr. Braden, a clinical psychologist, testified as an expert in trial competence. Braden testified that she received a court order to evaluate defendant's fitness to stand trial, and she met with defendant on January 13, 2020. During the evaluation, defendant's eye contact with Braden was fair to poor, and he did not want to provide information because he asserted that he was a sovereign citizen and society's rules did not apply to him. Braden discussed the charges with defendant to assess whether he understood them, as well as their potential consequences. Braden explained that her evaluations, generally, do not necessarily focus on what a defendant already knows, but, instead, on whether he or she can learn what is not known. Defendant told Braden that he disagreed with the charges because there were no statutes for them. For example, defendant asserted that he could not be charged with attempted armed robbery because he did not take any property; similarly, he believed that he could not be charged with aggravated assault because there was no bodily harm. Braden's attempts to educate defendant were unsuccessful, and he continued in his belief that the charges did not apply to him. Defendant ended the interview early and declined to return the next day to complete it. In Braden's opinion, defendant was not fit to stand trial, due to his inability to understand the charges and his inability or unwillingness to continue the evaluation for her to determine his understanding of the court process and participants, *i.e.*, the remaining components of fitness. Braden explained that

her time with defendant was short, but some sort of psychosis would be consistent with his competency deficits. Finally, Braden opined that, with treatment, it was "highly likely" that defendant would be returned to fitness within one year.

¶ 10 At the end of the trial, outside the presence of the jury, the State conceded that it was not able to sustain its burden of establishing fitness. The court made a finding that the State had not by a preponderance of the evidence demonstrated that defendant was fit to stand trial, but that Dr. Braden thought he could be restored to fitness within one year. The court remanded defendant to the Illinois Department of Health and Human Services (IDHS) and set a 90-day status.

¶ 11 On August 12, 2020, the State informed the court that, per a June 10, 2020, report, defendant remained unfit. Less than one month later, however, on September 10, 2020, with only the State present, a female "unidentified speaker" appeared, claimed to be present for defendant, and explained that she had spoken to a forensic coordinator and defendant had been restored to fitness. The State represented that it had not received a report finding defendant fit for trial.

¶ 12 The record thereafter reflects that, on September 18, 2020, a two-page IDHS report finding defendant fit to stand trial was filed.[1] A letter to Judge Stuckert, signed by a social worker/forensic coordinator, attached the report and explained that the report found defendant fit for trial and requested that defendant immediately be transported to the county jail. As such, also on September 18, 2020, Judge Stuckert issued an order, noting that the court had "received a report from the supervisor of the defendant's treatment" "that the defendant is FIT TO STAND TRIAL" and,

---

[1] The report was signed by an advanced practice nurse/psychiatric mental health nurse practitioner and co-signed by a physician interim medical director.

pursuant to section 104-20(e) of the Code (725 ILCS 5/104-20 (West 2018)), ordered his immediate transport to the county jail.

¶ 13    On October 27, 2020, now before Judge Montgomery, the State informed the court that defendant had "been found fit," was awaiting transfer into jail custody, and that the State understood that defendant intended to request the appointment of counsel.  The court continued the matter, with a written order reflecting that the case was continued for a "status review of fitness" and with a handwritten notation reflecting that defendant was "found fit" and should be transferred to the jail.

¶ 14    Similarly, on November 10, 2020, the State noted that, despite the court's transport orders, defendant remained at the mental health facility.  The State requested another date. The November 10, 2020, written court order reflected that the case was continued "for possible appointment of PD."

¶ 15    On November 24, 2020, the State and defendant (unrepresented by counsel) appeared via Zoom before Judge Montgomery.  The court told defendant that it was nice to see him again and asked defendant how he was doing; defendant answered, "I'm pretty swell."  The court confirmed that defendant had recently returned from IDHS and asked defendant, "are you on medication?" Defendant answered, "yes, sir."  The court asked defendant, "are you taking your medication?" Again, defendant answered, "yes, sir."  The court responded,

>      "Well, that's good to hear.  You look good to me, you sound good to me, it's nice to see you again.
>
>      Now, [defendant], I want to remind you that you have the right to a lawyer.  You understand that, right?"

¶ 16    The court then immediately proceeded to explain defendant's right to counsel. Defendant requested counsel, and the court said that it would appoint the Public Defender. Next, the court asked defendant whether he recalled its previous explanation that defendant faced "pretty serious charges." Defendant responded that he remembered, but the court said that it wished to start from the beginning. As such, the court reviewed with defendant the charges and possible sentencing ranges, as well as how defendant's criminal history could potentially impact sentencing. The court also explained to defendant other rights and possible penalties. The court set another date, so that defendant could have a public defender assigned to his case. At the close of the hearing, the court stated to defendant, "keep taking your medication. You look and sound terrific to me." Two written orders appear in the record on November 24, 2020. The first reflects appointment of the public defender. The second sets a date for arraignment and status, with a handwritten notation reflecting, "Defendant in custody DCJ, PD Appointed, R+P+I explained."

¶ 17    On December 8, 2020, defendant and his appointed counsel appeared in court via Zoom. The court commented that defendant was "looking good" and confirmed with defendant that he was "doing okay." A short date was set to allow defendant and counsel more time to discuss the case.

¶ 18    In April and May 2021, defense counsel filed and argued a motion to dismiss the charges, alleging that the court's handling of defendant's fitness to stand trial—when the State initially raised the concern in September 2019, but the court simply continued the case—had violated defendant's due process rights. The court essentially determined that there ultimately had been no prejudice and denied the motion. Also in May 2021, the court confirmed with defendant that he continued to take his medication and that everything was fine.

¶ 19    On June 30, 2021, in pretrial discussions, defense counsel noted for the court her concern that defendant had some mental health issues,

> "When I speak to him, there are times where he's very lucid, no issues, but there are other times where [defendant], I think, based on his medication, is rocking back and forth, has some facial tics as a result of that medication, so I'm sure he's not getting necessarily—he may be receiving the generic version of the medication as opposed to the medication that would not prompt those types of side effects.
>
> So that's my concern as well, that [defendant], too, may be displaying these side effects, but there's nothing I can do about that at this time because of the type of medication that he's receiving.
>
> So I'm concerned and I certainly don't want him to not take his medication, because I think it is helpful to him in many ways."

Later, on July 2, 2021, counsel explained that her concerns had been somewhat alleviated, in that the side-effect issues "come and go," but defendant would be seated in the courtroom in a position which would make less visible to the jury the side effects of his medication.

¶ 20    On July 20, 2021, defendant rejected the State's offer of a six-year sentence (the minimum) in exchange for a guilty plea. Trial commenced on July 26, 2021. Defendant did not testify, and the defense presented no evidence. On July 27, 2021, the jury convicted defendant of both charges.

¶ 21    On September 28, 2021, the court denied defendant's motion for a new trial, which had alleged, in part, due process violations based on the court's failure to order fitness evaluations at the bond and preliminary hearings, and which also noted that, on October 27, 2020, the court had entered a finding of fitness based on a IDHS report and defendant had not been present for that hearing. In denying the motion, the court noted that any mistakes in not ordering a fitness

evaluation early in the case were, essentially, remedied and did not violate defendant's due process rights. On December 8, 2021, the court also denied defendant's motion to reconsider the denial of the motion for a new trial. While it acknowledged an initial delay in ordering a fitness evaluation, the court disagreed that the delay ultimately impacted defendant's due process rights.

¶ 22                                B. Sentencing

¶ 23    On December 15, 2021, the court held a sentencing hearing. The court merged the aggravated-assault conviction into the attempted-armed-robbery conviction. The parties agreed that defendant should be sentenced as a Class X offender and that the court should consider a defense exhibit comprised of defendant's prison records and reflecting defendant's history with mental illness, including depression, paranoid schizophrenia, and visual and auditory hallucinations. The State argued that the court should consider three factors in aggravation: defendant's conduct threatened serious harm; his significant criminal history, which it summarized for the court; and the need to deter others. In part, defense counsel noted defendant's significant mental health issues, as well as the fact that, with respect to threat of harm, the knife was always held downward and was never wielded in anyone's direction during the events at issue.

¶ 24    In mitigation, the court considered and weighed defendant's history of mental illness. In aggravation, the court agreed with the State that three factors applied, including that defendant's conduct threatened serious harm, as defendant had displayed a knife that was "larger in character" during the offense; defendant's criminal history; and the need to deter others. The court noted defendant possessed an "extensive criminal history, including 11 prior felonies which included 10 prior [prison] sentences, the most significant of which include a 2007 robbery for which he received 10 years in [prison], and in 1993 he received 19 years in [prison] for attempted murder." Ultimately, although the State requested a 14-year term of imprisonment, the court sentenced

defendant to 9 years' imprisonment. The court noted, "[w]hen I look at the defendant's criminal history alone, a lengthy sentence would be appropriate *** but I can't and won't ignore the defendant's psychiatric issues which I think are significant and do outweigh the factors in aggravation." Defendant timely appeals.

¶ 25                                II. ANALYSIS

¶ 26    Defendant raises two issues on appeal. First, he argues that the trial court erred in either (1) finding him fit or (2) not deciding his fitness to stand trial after he received treatment. Defendant asserts that the court made no independent inquiry into his fitness and, instead, simply adopted the conclusion of a report finding him to be fit, "apparently without reading the report." Second, defendant argues that, at sentencing, the court erred in considering threat of harm as an aggravating factor, because his conduct did not present a degree of harm exceeding that inherent in the offense of attempted armed robbery. For the following reasons, we agree with defendant on the first issue, and we reverse and remand for a retrospective fitness hearing.

¶ 27                         A. Restoration to Fitness

¶ 28    As to the first issue, defendant notes that the trial court either summarily adopted, or never adopted, the conclusion in the mental health report that he was fit for trial. Instead, the court, based solely on the State's representation that the report concluded defendant's fitness was restored, proceeded with the case. Defendant argues that his due process rights were impacted, as the record does not reflect that the court affirmatively exercised any judicial discretion with respect to his fitness. Specifically, defendant notes that, after treatment, a hearing must be held to determine if a defendant has been restored to fitness and the court must make an independent, active inquiry into fitness and may not simply find fitness based solely on stipulations to an expert's conclusion. Here, he argues, there was no stipulation that defendant's fitness had been

restored, the State unilaterally informed the court that defendant had been found fit, and the court in an October 27, 2020, written order noted that defendant "was found fit;" yet the court never made any independent findings that defendant's fitness was restored, nor does it appear that it ever reviewed the fitness report. Defendant requests that we vacate his conviction and remand for a new trial or a new determination of his fitness to stand trial. Defendant acknowledges that this issue was not raised below, but requests that we review it for plain error.

¶ 29    The due process clause of the fourteenth amendment bars prosecution of a defendant who is unfit to stand trial. See *People v. Holt*, 2014 IL 116989, ¶ 51. A defendant is unfit for trial if a physical or mental condition prevents him or her from understanding the nature and purpose of the proceedings and assisting with the defense. 725 ILCS 5/104-10 (West 2018). While a trial court's fitness decision is typically reviewed for an abuse of discretion, the issue is one of constitutional dimension and the record must reflect an affirmative *exercise* of judicial discretion regarding a fitness determination. *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 28. Although defendant did not raise before the trial court the exact argument he raises here, a fitness determination concerns a substantial right, rendering second-prong, plain-error review appropriate. *Id.* ¶ 29; see also *People v. Herron*, 215 Ill. 2d 167, 179 (2005). When an error concerns a substantial right, prejudice is presumed. *Id.* at 187.

¶ 30    Section 104-20 of the Code requires the trial court, after finding a defendant to be unfit, to periodically review the issue of defendant's fitness at a hearing, in which the court, sitting without a jury, must determine whether the defendant is fit to stand trial. See 725 ILCS 5/104-20(a) (West 2018)). "[W]here a defendant was previously adjudicated to be unfit to stand trial, a presumption exists that the condition of unfitness remains until the defendant has been adjudicated to be fit at a valid subsequent hearing." *Id.* The court must be active, not passive, when evaluating a

defendant's fitness, may not solely rely on parties' stipulations to expert conclusions that the defendant is fit, and may not simply "rubber stamp" an expert's ultimate conclusion regarding fitness. *Id.*; see also *People v. Contorno*, 322 Ill. App. 3d 177, 179 (2001) ("The ultimate conclusion as to a defendant's fitness must be made by the trial court, not the experts."). Due process may be satisfied where the trial court relies not only on stipulations, but also its own review of the psychological report and observations of the defendant. See *People v. Cook*, 2014 IL App (2d) 130545, ¶ 15. However, it remains that,

"[I]n general, there should be a high level of judicial scrutiny in a restoration hearing. The constitutional ramifications and liberty interests at stake justify careful consideration of the expert's opinion. Extra precautions may be needed to ensure the bases and grounds set forth in the expert's report are justified and satisfactory to the court's determination. A potential error in the Department's restoration finding may subject an otherwise unfit person to a trial and sentencing. Because the due process clause forbids conviction of a defendant who is unfit to stand trial, the court should take great care to ensure to its satisfaction the defendant's fitness has been restored. That is, the court should take steps to ensure the defendant is indeed able to understand the nature of the proceedings and to assist in his own defense." (Internal citations omitted.) *People v. Gillon*, 2016 IL App (4th) 140801, ¶ 27.

¶ 31    Here, the State disagrees that there was any error. Specifically, the State observes that, on October 27, 2020, it explained to the court that a psychiatric evaluation had been completed that found defendant fit for trial. As such, it agrees that the court's order on that date did not indicate that the *court* found defendant fit but, rather, simply served to document that a fitness finding was made by a mental-health evaluator. The State then asserts that the court set the matter for

November 24, 2020, "for further status on defendant's fitness" and that, on that date, after "having received the fitness report at the previous hearing," the court "made independent, in-court observations of defendant," conducted its own assessment of him, and was satisfied that defendant was fit for trial as "reflected by its verifying that he was taking his prescription medication and that he looked and sounded 'terrific.' " The State notes that the court emphasized to defendant the importance of continuing to take his medication and, after confirming with defendant that he understood his rights, the nature of the proceedings, the possible penalties, and that a public defender would be appointed to represent him, concluded the hearing by advising him to keep taking his medication and noting that he looked and sounded "terrific." As such, the State argues, the court assessed defendant's fitness based on its own questions and observations of him and concluded that defendant looked and sounded well before setting the matter for further pretrial proceedings. According to the State, there is no requirement that the court independently question a defendant or make express findings of fact regarding fitness. Further, the State argues that the court here was active in making the fitness determination and had ample opportunity to observe defendant. The State contends that the court's receipt and review of the fitness report prior to the hearing is evidenced by its verification that defendant was taking prescription medication. The State concludes that, because the record demonstrates that defendant was able to consult and cooperate with his appointed counsel and makes no claim that he was unfit at the time of trial, the "fitness restoration hearing" did not offend minimal due process guarantees. We disagree.

¶ 32    Here, the court never expressly made a fitness finding. There is simply nothing in the record reflecting that the court reviewed the IDHS report, conducted any analysis of the report or the treating medical team's conclusion of fitness, or otherwise exercised its discretion to find

defendant fit.[2]  Nor was the court in receipt of any stipulation by the parties that an expert would testify consistent with the report that defendant had been restored to fitness.  We question whether, because this case vacillated between different judges, the orders and representations to the court that defendant had been "found fit" suggested completion of a hearing and exercise of court discretion that never actually happened.  Be that as it may, it appears that a restoration hearing fell through the cracks.  As a result, the record contains no court order reflecting that the court found defendant restored to fitness, nor that a restoration hearing was ever held.

¶ 33     The State's attempt to manifest into reality fitness findings and a restoration hearing that did not occur must fail.  Indeed, the State's arguments rely on faulty premises.  For example, the State incorrectly reports that the court scheduled the November 24, 2020, hearing as a fitness hearing.  This is incorrect.  Rather, on October 27, 2020, the court set a November 10, 2020, date for a "status on fitness," but then nothing happened on that day because defendant was not present.  As such, the court set a November 24, 2020, date, but only for "possible appointment of PD."  Consistent with that designation, the eight-page transcript from the November 24, 2020, hearing consists almost entirely of the court explaining to defendant his rights, including to the appointment of counsel, and, in fact, its act of appointing counsel.  The written order from that day

---

[2]We note that the report was signed by a psychiatric nurse, co-signed by a physician medical director, and submitted by a social worker, but it is not clear who performed defendant's assessment.  At least one court has suggested that, where the report does not make clear that the fitness decision was made by a licensed psychiatrist or psychologist, the court might perhaps be required to perform an even more thorough analysis of the fitness decision than otherwise necessary.  See *Gillon*, 2016 IL App (4th) 140801, ¶ 29.

does not reflect that the court found defendant restored to fitness; rather, it shows only that the public defender had been appointed and defendant had been apprised of various rights. At the hearing, no stipulations were made regarding the fitness report or the contents therein; indeed, the fitness report was not ever *mentioned*. The State goes to great lengths to stretch the court's opening and closing pleasantries with defendant as a fitness assessment, but we must reject those efforts. While a court's observations of a defendant can support a fitness finding, and while there may be no explicit requirement that the court question a defendant about his or her fitness or specify all of its reasons for finding fitness, the record typically reflects that the court's observations and ultimate finding were accompanied by a review of the psychological report and/or certain stipulations by the parties. See, *e.g.*, *Cook*, 2014 IL App (2d) 130545, ¶ 15 (court must state on the record the factual basis for its finding); *cf. People v. Goodman*, 347 Ill. App. 3d 278, 297 (2004) (no statute or supreme court rule requires the court to make express findings of fact regarding fitness). The fact remains that, here, the record does not reflect that the court ever actually *made* an affirmative finding that defendant had been restored to fitness, there was nothing indicating that it had reviewed the report, there were no stipulations made by the parties or evidence offered, and the State cites no authority that the court's observations *alone* reflect it exercised discretion in finding defendant fit.

¶ 34 Further, while the State asserts that the record reflects that the court reviewed the report because it knew defendant was taking medication, this is also incorrect. It is not clear that the court already knew that defendant was taking medication; rather, the court *asked* defendant if he was on medication. When defendant responded that he was, the court asked him whether he was taking it, expressed that defendant should continue to do so, and expressed its opinion that defendant looked and sounded "terrific" (we note that the court's observations of defendant's

appearance and manner were attained remotely via Zoom). Therefore, it is not clear that the court had previously considered the report and bases for IDHS's findings or did anything more than ask a few preliminary questions before proceeding with the hearing's purpose of appointing counsel and explaining to defendant the charges and his rights. See *e.g.*, *People v. Scott*, 2020 IL App (2d) 180378, ¶ 20 (holding, in that case, that no *bona fide* doubt of fitness required a fitness hearing, but also rejecting the implication that comments by a court at a status hearing that defendant had been found fit somehow constituted a fitness hearing; "that reading overinterprets the comments"; rather, the court found that counsel and the court had simply remarked that the psychologist had found the defendant fit, and "there was no suggestion that the trial court was itself making an affirmative finding of fitness[.]"). Moreover, as noted, until the contrary is shown, the presumption at a restoration hearing is that the defendant is unfit, and, so, the question here is whether the trial court could rule out the possibility that defendant was *still* unfit. See *Gipson*, 2015 IL App (1st) 122451, ¶ 36. On this record, we cannot conclude that defendant's succinct answers to the court's questions at the November 24, 2020, hearing, could adequately rule out the possibility that he remained unfit. Indeed, in September 2019, the same trial judge found defendant's answers to similar questions were appropriate, lucid, and did not implicate his competency; yet, at that same hearing, the State, jail personnel, and defendant's family had expressed a *bona fide* doubt as to fitness. In fact, shortly thereafter, a different judge ordered a fitness evaluation and defendant was found unfit. Thus, on this record, that defendant could again appropriately respond when the judge explained to him his rights does not eliminate the possibility that defendant remained unfit.[3]

---

[3]We again note that, shortly before trial, defendant's counsel expressed concern about defendant's lucidity and physical symptoms.

¶ 35    In sum, there was error in that defendant was tried without any court finding of restored fitness. Historically, denial of a proper fitness hearing resulted in a reversal and remand for a new trial; however, the norm has shifted to retrospective fitness hearings, rather than automatic reversal. See, *e.g.*, *People v. Payne*, 2018 IL App (3d) 160105, ¶¶ 11-14. Here, defendant's trial and sentence occurred roughly 12 to 18 months ago (*i.e.*, trial commenced July 2021; sentencing in December 2021), and it is possible that there remains sufficient evidence from, and knowledge contemporaneous to, defendant's trial for the court to conduct a retrospective fitness hearing. At that hearing, the parties may present testimony from the experts who evaluated defendant and found him fit and/or may consider any stipulations that are appropriate. If the court determines that the evidence is inconclusive or suggests that defendant was unfit, defendant is entitled to a new trial. See *Gipson*, 2015 IL App (1st) 122451, ¶ 38. However, if the court determines at the retrospective fitness hearing that defendant's fitness at his prior trial can be "accurately assessed and confirmed, his conviction may be affirmed." *Id.*; see also *Cook*, 2014 IL App (2d) 130545, ¶ 22.

¶ 36                              B. Sentencing

¶ 37    Defendant also argues that the court erred in considering in aggravation a factor inherent in the offense of attempted armed robbery. Specifically, he contends that the court explicitly considered aggravating that his actions caused a threat of harm, in that, during the crime, he displayed a large knife, but defendant argues that this was error, because a threat of force is already inherent in the offense of attempted armed robbery. Accordingly, defendant argues that the court's consideration of this factor constitutes a double enhancement, warranting a new sentencing hearing. In addition, he notes that the court clearly relied on the factor in aggravation but did not elaborate or discuss the gravity of the conduct that would warrant its consideration in aggravation

and, indeed, where the weapon was simply displayed, but not otherwise brandished, the evidence did not reflect conduct sufficiently grave to distinguish it from a typical attempted armed robbery. Defendant acknowledges that, when it can be determined on the record that the weight placed on the improper factor was insignificant, remand is not required. However, he disagrees that such is the case here, where the court's comments do not reflect how much weight it placed on the improper factor. Defendant requests that this issue be reviewed for plain error, as it was not raised below, and asserts we may reverse under either prong of the plain-error analysis.

¶ 38    The State responds that there was no error and no second-prong plain error.[4]  It asserts that the court did not consider defendant being armed and the threat of harm as an aggravating factor, so much as it properly considered the nature and circumstances of the offense. Specifically, the State notes that, when determining the length of a sentence within the sentencing range, "the trial court may consider as an aggravating factor the degree of harm, as well as the manner, seriousness, nature, and circumstances of the offense, even where that harm is arguably implicit in the offense of which the defendant is convicted." *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009). As such, the State contends that the court properly considered the circumstance that defendant was armed with a large knife "in the context of being a previously convicted violent offender with convictions for robbery and attempted murder. The record shows that defendant's aggressive temperament while armed with a large kitchen knife, as opposed to a smaller blade, made the situation not simply dangerous, but potentially deadly. This was not a situation where a person without a criminal history became upset in a bank." The State further notes that, while displaying

---

[4]The State mistakenly responds that defendant requests review under only the second plain-error prong; defendant's opening brief does, in fact, request review under both prongs.

the large knife, defendant threatened the banker that he should not "fuck" with defendant, circumstances not inherent in the offense and constituting factors the court properly found aggravating. Finally, the State notes that defendant received an "extremely light sentence" for someone with his extensive criminal history, as the court properly considered in mitigation his mental health issues, and, thus, the record demonstrates that the weight placed upon the threat of serious harm was so insignificant that it did not lead to a greater sentence. The State concludes that, when determining whether the court based its sentence on proper aggravating and mitigating factors, we should consider the record as a whole, rather than focusing on a few words or statements, and it concludes that no plain error overcoming forfeiture occurred here.

¶ 39 Preliminarily, we note that defendant is correct that, although he is raising this issue for the first time on appeal, we may review it for plain error. Sentencing errors are reviewable for plain error where: (1) the evidence was closely balanced (first prong); or (2) the error was so serious that it deprived the defendant of a fair sentencing hearing (second prong). See, *e.g.*, *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *People v. Ahlers*, 402 Ill. App. 3d 726, 734 (2010); see Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The second prong "is potentially present here, because when a trial court considers erroneous aggravating factors in determining the appropriate sentence of imprisonment, the defendant's 'fundamental right to liberty' is unjustly affected, which is seen as serious error." (Citation omitted.) *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 7. Under either prong, the burden of persuasion rests on the defendant. *People v. Walker*, 232 Ill. 2d 113, 124 (2009). If the defendant fails to meet his or her burden, we must honor the forfeiture or procedural default. *Id.* The first step in any plain-error analysis is to determine whether error occurred. *Id.* at 124-25.

¶ 40     Generally, the imposition of a sentence rests within a trial court's discretion, there exists a strong presumption that the court based its sentencing determination on proper legal reasoning, and we review that decision with great deference. See, *e.g.*, *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8. The presumption is overcome only by an affirmative showing that the sentence imposed varies greatly from the purpose and spirit of the law or manifestly violates constitutional guidelines. *Id.* However, we review *de novo* the question of whether a court relied on an improper sentencing factor. *Id.* In fashioning a sentence, a trial court may not consider an improper aggravating factor (see, *e.g.*, *People v. Higgins*, 2016 IL App (3d) 140112, ¶ 29), such as a factor implicit in the offense, as dual use of a single factor constitutes double enhancement (see, *e.g.*, *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9). Nevertheless, even despite a court's consideration of an improper factor, we may affirm a sentence if the record reflects that the weight the court placed on that factor was so insignificant that it did not result in a greater sentence. *People v. Heider*, 231 Ill. 2d 1, 21 (2008).

¶ 41     Here, we agree with defendant that the court considered an improper aggravating factor, namely, that his possession of a large knife during the offense threatened serious harm. Specifically, defendant was convicted of attempted armed robbery, *i.e.*, having taken a substantial step towards committing armed robbery. See 720 ILCS 5/8-4 (West 2020). A person commits the offense of armed robbery when he or she, while carrying on or about his or her person or otherwise armed with a dangerous weapon (other than a firearm), knowingly takes property from the person or presence of another by the *use of force*, or by *threatening the imminent use of force*. See 720 ILCS 5/18-1(a), 18-2(a)(1) (West 2020). Thus, as defendant points out, a threat of serious harm by a weapon is inherent in any attempted armed robbery, as it must be committed while armed with a dangerous weapon and by using force or threatening force. See, *e.g.*, *People v. Flanery*, 229 Ill. App. 3d 497, 502 (1992) (remanded for a new sentencing hearing after the trial court found

in aggravation that the defendant's offense threatened serious harm, where he committed an armed robbery with a gun because "the evidence presented showed nothing more than the defendant committed a robbery using a dangerous weapon; an element present in every armed robbery"). As defendant notes, other than mentioning that the knife was large in character and defendant's mere possession of it, the court here did not elaborate on how the factor was aggravating to a degree *beyond* that inherent in the offense. See *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 14. And we must reject the State's argument that the court did not consider the threat of harm as an aggravating factor but, instead, properly considered it merely as a circumstance of the offense. In this case, the court expressly accepted and mirrored the aggravating factors urged by the State, and it stated that it was considering the threat of serious harm *as an aggravating factor*. *Id.* ¶¶ 12, 14, 16 (noting, "the mirroring between the factors the State argued in aggravation and the factors used by the trial court in sentencing shows that there was, in fact, reliance by the trial court on the implicit factor" and distinguishing the court's reliance on the improper factor, with no discussion of the degree or gravity of the defendant's conduct, from cases where courts engage in such a discussion to properly consider the nature and circumstances of the offense); see also *Dowding*, 388 Ill. App. 3d at 944 (where the court "expressly stated" that a factor inherent in the offense was an aggravating factor upon which the sentence was based, it did not merely consider it as a circumstance of the offense).

¶ 42    Thus, we conclude that the trial court here improperly considered the threat of serious harm as an aggravating factor, as it was inherent in the offense. However, we also conclude that a new sentencing hearing is not necessary, because the weight, if any, the court placed on that improper factor was insignificant. When determining whether a court has afforded significant weight to an improper factor such that a remand for resentencing is required, we consider whether: (1) the court

made "dismissive or emphatic comments in reciting its consideration of the improper factor;" and (2) the sentence was "substantially less than the maximum sentence permissible by statute." *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 18. Here, when reciting its consideration of the threat of serious harm, the court made only short comments, which were neither dismissive nor emphatic; indeed, it simply stated that it considered it in aggravation. If this were the only aggravating factor the court mentioned, we might not be able to discern how much weight it placed on the improper factor. But we are to consider the record as a whole (see, *e.g.*, *Dowding*, 388 Ill. App. 3d at 942) and remain mindful that the court *did* emphasize another aggravating factor. Specifically, the court stated it was considering in aggravation defendant's significant criminal history, it detailed that history, and emphasized that that factor *alone* justified a lengthy sentence. Nevertheless, and as relevant to the second consideration mentioned above, it found even *that* aggravating factor was outweighed by the mitigating evidence, namely, defendant's mental-health history. Defendant concedes that the court emphasized his criminal history but suggests that it remains unclear the weight the court placed on the improper inherent factor, since it found the criminal history outweighed by the mitigating evidence. We disagree. Viewed in full context, where the court emphasized defendant's criminal history as "alone" warranting a lengthy sentence, but then decided not to impose one, we cannot find that its reliance on the improper factor was anything but minimal. Indeed, the court imposed a 9-year sentence, which was only 3 years above the minimum and was substantially less than the 30-year maximum sentence for which defendant was eligible, given that he was being sentenced as a Class X offender. As such, on this record, we conclude that the weight, if any, that the court placed on the improper factor was insignificant. Accordingly, there is no plain error and we honor the procedural default. If, at his retrospective fitness hearing, defendant is found to have been fit for trial, his sentence stands.

¶ 43    We note, however, that consistent with this decision, if defendant at his retrospective fitness hearing is ultimately found to have been unfit for trial, is later found fit and is re-tried, convicted, and subject to a new sentencing hearing, the sentencing court should be mindful not to consider in aggravation factors inherent in the offense.

¶ 44                          III. CONCLUSION

¶ 45    For the reasons stated, the judgment of the circuit court of De Kalb County is reversed and the case is remanded for further proceedings consistent with this decision.

¶ 46    Reversed and remanded.